1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,          Jacksonville, Florida

       Plaintiff,          Case Nos. 3:12-cr-157-MMH-MCR
                                3:13-cr-83-MMH-JRK

-vs-

                          April 1, 2014

EDDIE BATTLES,          1:37 p.m.

       Defendant.          Courtroom 10B

_____

**TRANSCRIPT OF SENTENCING**
BEFORE THE HONORABLE MARCIA MORALES HOWARD
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S**

GOVERNMENT COUNSEL:

    **Frank Talbot, Esquire**
    United States Attorney's Office
    300 North Hogan Street, Suite 700
    Jacksonville, FL  32202

DEFENSE COUNSEL:

    **Vanessa Newtson, Esquire**
    Finnell, McGuinness, Nezami & Andux, PA
    2114 Oak Street
    Jacksonville, FL  32204

OFFICIAL COURT REPORTER:

    Shelli Kozachenko, RPR, CRR, CRC
    221 North Hogan Street, #185
    Jacksonville, FL  32202
    Telephone:  (904) 301-6842

                    (Proceedings reported by stenography;
                    transcript produced by computer.)

# T A B L E   O F   C O N T E N T S

**COMMENTS IN ALLOCUTION:**                                    **Page No.**

TAMEKA BATTLES.................................     38

KADURICK WALKER................................     40

DEFENDANT EDDIE BATTLES........................     42

<u>P R O C E E D I N G S</u>

April 1, 2014                                    1:37 a.m.

- - -

COURT SECURITY OFFICER:  All rise.  This Honorable Court is now in session.

Please be seated.

THE COURT:  All right.  We're here on two cases, 3:12-cr-157-J-99-MMH-MCR and 3:13-cr-83-J -- that's not right.

Can I see you?

(Judge and courtroom deputy conferring inaudibly.)

THE COURT:  So -- okay.  All right.  Mr. Talbot is here for the United States.  Ms. Newtson is here for Mr. Battles.

And you are Eddie Battles, sir?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  All right.  We're scheduled for a sentencing.

Is the United States prepared to proceed?

MR. TALBOT:  Yes, Your Honor.

THE COURT:  And you, Ms. Newtson?

MS. NEWTSON:  Yes, Your Honor.

THE COURT:  All right.  Mr. Battles, on June 20th of 2013, you entered guilty pleas in two cases.

As to docket No. 3:12-cr-157-J-34MCR, you entered pleas of guilty to Counts One, Two, Three, Four, Five, Seven,

Nine, Ten, and Eleven.  Counts One, Three, Five, Seven, Nine, Ten, and Eleven charged you with robbery affecting commerce and aiding and abetting robbery affecting commerce, in violation of Title 18, United States Code, Section 1951(a) and Section 2.

And Counts Two and Four charged you with brandishing a firearm in furtherance of a drug trafficking crime -- is that right?  That's not right.  Brandishing a firearm in furtherance of the robbery, I assume.

MR. TALBOT:  In furtherance of a crime of violence.  It's actually the same statute.  It's the 924(c) statute.

THE COURT:  Yeah.  Counts Two and Four charged you with brandishing a firearm in furtherance of a crime of violence, in violation of Title 18, United States Code, Section 924(c).

And as to docket number -- or Case No. 3:13-cr-83-J-34JRK, you entered pleas of guilty to Counts One, Two, Three, and Four, which charged you with robbery affecting commerce, in violation of Title 18, United States Code, Sections -- Section 1951(a).

The Court has accepted your guilty pleas as to these cases.  And the probation office has prepared a presentence report, and what's supposed to happen next is that you're supposed to review that presentence report with your attorney.

Did you have an opportunity to do that, sir?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And did Ms. Newtson answer any questions that you may have had about the presentence report?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Ms. Newtson, did you have sufficient opportunity to review the PSR with this gentleman?

MS. NEWTSON:  Yes, Your Honor.

THE COURT:  Does he have any outstanding objections to the factual statements contained in the presentence report or the guideline calculations?

MS. NEWTSON:  There's just one item that was provided at the end, just one objection that we had.

THE COURT:  Is that the objection to the sentence in paragraph 30 that "Battles told Williams that Battles would meet Williams at a nearby store after the robbery"?

MS. NEWTSON:  Yes, Your Honor.

THE COURT:  Ms. Newtson, looking at the factual basis of the plea agreement, on page 3, the paragraph at the bottom of the page reads:  "On March 27th, 2012, Battles drove Eric Williams to the Dollar General in White Springs, Florida, in Hamilton County.  Battles told Williams that he would meet him at a nearby store after the robbery."

MS. NEWTSON:  I understand, Your Honor.  And after speaking to my client when we were reviewing that, he said that, in fact, he told him to meet him right where he dropped him off.

So that was -- that was the difference, Your Honor. So it's just -- it's factual, Your Honor. I don't believe it would change, basically, anything else.

THE COURT: All right. Mr. Talbot, what's the government's position on this?

MR. TALBOT: I mean, I have no objection if it reads that he told him he'd meet him after the robbery. I mean, if that's the -- if there was a particular location in mind doesn't really matter. I mean, they met up after the robbery and left the area together.

THE COURT: Ms. Newtson, would it be sufficient to revise that sentence to read, "Battles told Williams that Battles would meet him after the robbery"?

MS. NEWTSON: Yes, Your Honor.

MR. TALBOT: That's fine.

THE COURT: Okay. Then I'll make that change. Just a moment.

So what I've done is I've stricken the words "at a nearby store" and the sentence now reads, "Battles told Williams that Battles would meet Williams after the robbery."

Any other objections, Ms. Newtson?

MS. NEWTSON: No, Your Honor.

THE COURT: All right. Mr. Talbot, any objections by the United States?

MR. TALBOT: No, Your Honor.

THE COURT:  Then there being no further objections, the Court will accept the factual statements set forth in the presentence report as the Court's findings of fact and determines that the guidelines applicable to Mr. Battles are as follows:

The total offense level is 30.  Criminal history category is II.  That gives us a guideline term of imprisonment of 108 to 135 months with respect to Counts One, Three, Five, Seven, Nine, Ten, and Eleven in the 2012 case, as well as the four counts in the 2013 case; 84 months' imprisonment, which must run consecutive, as to Count Two in the 2012 case; and 300 months' imprisonment, which also must run consecutive, as to Count Four in the 2012 case.

One to three years' supervised release as to Counts One, Three, Five, Seven, Nine, Ten, and Eleven in the 2012 case and Counts One through Four in the 2013 case and two to five years' supervised release as to Counts Two through Four in the 2012 case; restitution in the amount of $18,556; fines ranging from 15,000 to $150,000; and $1300 in special assessments.

Is that consistent with your understanding, Ms. Newtson?

MS. NEWTSON:  Under the PSR, yes, Your Honor.

THE COURT:  All right.  And yours, Mr. Talbot?

MR. TALBOT:  It is, Your Honor.  The only thing I'll note, on the restitution the amount is lower because some of

the money was recovered.

THE COURT:  Okay.  The $1236?

MR. TALBOT:  The very last one when they got caught, that money was recovered, and so --

THE COURT:  Okay.  Just a moment.

Oh, so that needs to be deducted from the total.

MR. TALBOT:  Right.  It's accurate in terms of the total money stolen, but in terms of -- in the money judgment that -- the consent money judgment that we've submitted has, I beli- -- has the correct figure, and that will also be the figure for forfeiture, which is $17,320.

THE COURT:  Okay.  All right.  So I'm going -- let me -- all right.

So I'm going to note in paragraph 39 that the April 18th $1236 was recovered, giving us a total of 17,320 in restitution, and then that carries over to paragraph 172, for the correct figure to be 17,320.

Anything else, Mr. Talbot?

MR. TALBOT:  No, Your Honor.

THE COURT:  All right.  All right.  Are there -- Mr. Talbot, have you -- did the U.S. Attorney's Office give notice to all of the individuals that were victims of the various robberies?

MR. TALBOT:  We did, Your Honor, and we are not anticipating that there will be any victims in court today.

THE COURT: Okay. For purposes of the record, let me just ask whether there's anybody present in the courtroom who believes themselves to be a victim of Mr. Battles' offenses.

(No response.)

THE COURT: All right. I see none, and Mr. Talbot has represented that the United States did not anticipate anybody's presence.

And so with that, I think where we are is there's been a motion filed by the United States for a reduction of the defendant's sentence. It's document No. 69, filed under Section 5K1.1 of the sentencing guidelines, as well as 18, United States Code, Section 3553(e).

And, Mr. Talbot, do you wish to be heard as to that motion?

MR. TALBOT: Yes, Your Honor.

And obviously, Your Honor, we're going to ask the Court to grant a four-level reduction in Mr. Battles' case.

I do want to talk a little bit about how I'm going to ask the Court to fashion that reduction because it is not -- it's not unusual that we have a 924(c) charge; it's a little unusual that we have two. And, of course, it does drive the penalties quite higher, especially with, before the 5K, a 32-year mandatory consecutive sentence.

Because of the way I'm going to ask the Court to fashion the 5K, I am going to argue for this as an appropriate

and reasonable sentence at -- in Mr. Battles' case.  But let me just -- let me do the math so I can explain how I'm -- how I'm arriving at this.

First of all, the robbery -- the guidelines for the robberies is easy.  He's at a 30, Level II.  I'm going to ask the Court to drop down to a 26/II, which puts us at a 70- to 87-month range.  And I'm going to ask Your Honor to sentence at the bottom of that range for 70 months on all of the robbery counts, all to run concurrent with each other, so 70 months for the -- for the robberies.

For the first 924(c), the first thing that I did is I tried to calculate where we first hit 84 months -- I gave it a guideline range.  So I looked at the guidelines at Category II and came to offense level 26.  That's 70 to 87 months, and so that was the -- my, quite honestly, arbitrary range that I gave Mr. Battles for that count, for that 924(c).

And so because -- because of the 5K, the Court can go below -- obviously below the 60-month -- I'm sorry, I said 60-month.  The five-year --

THE COURT:  It's not a five-year.

MR. TALBOT:  It's seven.

THE COURT:  It's seven years.

MR. TALBOT:  I'm sorry.  I'm used to -- again, I'm used it to being five years.  It's seven.  I wrote all this out, and I'm still messing it up.

Seven years, 84 months.  I hit 84 months at the 26. I'm coming down to 22, off four levels.  I'm at 46 to 57 months for the first 924(c).  I'm going to recommend a sentence of 46 months consecutive for the first 924(c), which is Count Two in the -- in the Duval -- the Jacksonville case.

For Count Four, I create a guideline range of 262 to 327 months.  That's 38, Category II, because that's the first spot on Category II that I pick up 300 months.  And so that's my -- that's why I'm picking that -- that level so that I can give four levels off for that.

Is that --

THE COURT:  Yeah.  I'm following you.

MR. TALBOT:  If you're following.

THE COURT:  I'm surprised I'm following you, but I am.

MR. TALBOT:  I come down to a 34/Category II which is 168 months to 210 months.  At the low end, which is going to be my recommendation, it's 168 months consecutive.

So at the end of the day, for all the robbery counts I'm at 70 months, concurrent with one another.  Then I'm -- I have 46 months for Count Two consecutive and 168 months for Count Four consecutive, for a total sentence of 284 months, which represents over a 14-year reduction in the -- in the -- from where he would have been at the low end of the guidelines without a substantial assistance motion.

I do want to recognize that what -- and in all candor, when I first got Mr. Battles' case -- first of all, I pretty much knew he was going to be detained, that there was, you know, not going to really be an opportunity for a bond for him.

And I also knew that based on his relative lack of criminal record, that he really wasn't -- well, I say lack of it.  He pretty much didn't have a criminal record, and this was -- and I'm sure we're going to hear this a lot.  This was out of -- out of character, out of the ordinary for this man.

I really didn't -- I really didn't think he'd be able to do anything towards substantial assistance, and I was wrong. He did, but what he did was what he could do where -- where he was.

But in the case that was sentenced yesterday on Mr. Spiker, it was Mr. Battles who first brought that to the attention of law enforcement.  And so he was the first person that let anybody -- well, he let his attorney know, who let us know, and then the FBI responded.  And that obviously ultimately led to the beginning of that case, which ultimately was a 60-year sentence against Mr. Spiker for trying to kill a judge and a prosecutor.

So in terms of the significance of the case that he cooperated in, it is significant, and -- but Mr. Battles, you know, he -- he did what he could do in the situation that he

was in to help himself out, and he did.

And so in terms of the 5K motion -- and I know I'm making a four-level recommendation and I'm also including a reduction in the 924(c) charges to arrive at a total incarceration sentence of 284 months.  And that's going to be the recommendation in terms of the ultimate sentence and in terms of the reduction I'm going to ask the Court to give.

THE COURT:  All right.  I understand the recommendation.

To the -- to the extent that you're proposing how the Court address that, I -- I'm not sure that it is -- I'm not sure that I'm in agreement with how you suggested that the Court apply the four-level reduction with respect to the -- to Count Two and Count Four.

But let me hear from Ms. Newtson, and then I'll -- I'll figure out what to do with that.

MR. TALBOT:  Yes, Your Honor.

THE COURT:  And, Ms. Newtson, let me ask you to start just -- let's just deal with the motion -- the 5K motion now, and then I'll hear your arguments with regard to sentencing.

MS. NEWTSON:  Your Honor, regarding the 5K motion, I did file the defendant's sentencing memorandum, which is document 78, and I do address that there, starting on page 2 of 7.

And, again, I also have the defense reasoning as to

all this, if Your Honor would allow.

THE COURT:  Yeah.  Go ahead.

MS. NEWTSON:  Okay.  Regarding the 5K, Your Honor, again, as Mr. Talbot stated, that Mr. Battles doesn't have a history for this kind of charge.  He has some minor history but nothing that we would consider, I believe, violent.

So, again, because of the nature of the charges, the likelihood was he was going to remain in detention.  He did not oppose detention.  And therefore he was in a situation where he was in Baker County since October -- I want to say October 3rd, maybe, 2012.  He's been held in confinement in Baker County the entire time he's been there, and people would come and go while he was in confinement.

And because of the nature of the way Mr. Battles is -- he's a very nice person -- people seem to open up, talk to him, confide in him.  And three different individuals specifically confided in him and basically admitted that they committed crimes or were looking to do crimes, and that has to do with the 5K.

Again, the most important one being, I believe, Robert Spiker.  Mr. Talbot is correct.  Mr. Battles is the first one that basically sounded the alarm.

But just a brief background on that, Your Honor. Mr. Spiker contacted Mr. Battles, like, on a Saturday and basically, you know, told Mr. Battles, "I met some people that

are part of Al-Qaeda. It's an underground cell in Florida. I talked to them about killing Mark Devereaux." And he was basically soliciting Mr. Battles to figure out a way to kill Mr. Devereaux or find someone for Mr. Spiker to do that.

And, again, this was on a Saturday, and there was some back-and-forth of letters, and that was all provided to the government. Mr. Battles took Mr. Spiker seriously right away on this Saturday. He believed him to be very dangerous. He had seen Mr. Spiker before at Baker. You know, he had left for a while; he came back, so he knew he was dangerous.

And Mr. Spiker even told Mr. Battles that not only did he mean to harm Mr. Devereaux, but he would harm his wife and his children. And as soon as Mr. Battles heard all this, all this in a letter, he immediately put in an emergency request to go see the nurse, because, again, he's in confinement. He can't just walk up to a phone, call anybody.

So there's a tip number for the inmates at Baker County, and he -- he's like, "I didn't know what to do. It's a weekend." He obviously didn't know how to contact me on the weekend also.

So he called in and basically put on this tip number what was going on, which led to the following day, Sunday morning, to -- someone from Baker investigation -- I don't know if it was, like, the local police or whatnot, but it was a lieutenant that pulled him out, and he talked to him.

Mr. Battles talked to him and told him what was going on, and that person is the one that said he would contact the marshals, which I believe probably happened that Sunday.

Because all I know, it's Monday morning.  I'm at the doctor's office with my baby, and I get a call from Mr. Devereaux, and he says, "The FBI is going to talk to your client.  Do you have an objection?"  And he kind of told me what happened, and I said, "Of course not."

So, again, this is a thing that Mr. Battles did on his own, without benefit of guidance of counsel or anything like that.  He did it because it's the type of thing that he would normally do, regardless.

So then he met with different, you know, individuals, told them what happened, and at least, I guess, that put the highlight on Mr. Spiker and what his possible intentions could be.

And then through reading the paper articles, which is how I also get my news on Mr. Spiker, come to find out that other inmates obviously were able to provide information that thankfully led to Mr. Devereaux not being harmed.

So I think it really does show what kind of person Mr. Battles is, that -- you'll hear in a little while from a family member and a friend, a former employer, that this is the kind of person Eddie Battles is, that he was always there to help people, and this is the kind of thing that he would do.

Besides Robert Spiker, Your Honor, he also helped in the end part of the investigations for two other inmates.  One of them is John Spaulding, and he was in for different armed robberies for multiple counts, and he did get sentenced.  I believe he got 38 years in federal prison.

He also confessed to Mr. Battles that he committed the crimes.  And of course, then, that was, you know, relayed to Mr. Talbot and his office and the agents.  And I believe if Mr. Spaulding would have gone to trial, then Mr. Battles could have been a rebuttal witness.  That was the purpose, you know, of possibly calling him at a trial.

Then the other person that he provided information on was Joshua Spires.  I believe he got 30 months in state prison.  That was a state case.  He was being housed in Baker County, and his incident was sexual in nature regarding a minor.

And, again, he admitted to Mr. Battles, you know, what he did, and if he would have gone to trial, I believe that that state prosecutor would have actually used Mr. Battles as, you know, a main witness.

So these, you know, are the sum, let's say, of those cases that he was able to help with.  And, again, it was these people coming to him.  He wasn't searching out these real bad guys; they came to him.  Of course, once he got the information, he knew the right thing to do was to turn it over and cooperate regarding that.

So then we come to the 5K, which thankfully has that 3553(e) language in it also that allows the Court to go below the minimum mandatories.

Mr. Talbot's asking for a four-level reduction.  On the defense side, Your Honor, we just feel that, with everything that Mr. Battles provided, that it warrants more than a four-level reduction.  I would hate to put a specific number on it, not knowing what the Court may or may -- may think is more appropriate.  But, you know, again, we would move for a greater-level reduction than four.

And, you know, that's regarding the 5K and how we got to that situation.  I've got plenty of argument about criminal history category and about the 924(c)s.  I don't know if this is the appropriate time Your Honor wants me to talk about that since we're talking about guidelines?

THE COURT:  Sure.  Go ahead.

MS. NEWTSON:  Yes, Your Honor.

THE COURT:  Criminal history category, though, you did address that in your sentencing memorandum --

MS. NEWTSON:  Yes.

THE COURT:  -- but I'm assuming that you're just addressing that in terms of a variance, not as far as a guideline departure.  Is that --

MS. NEWTSON:  Well, Your Honor, yes.  We do feel that, based on his very small criminal history, that he's in

Criminal History Category II because of one charge of a misdemeanor DUI. That's -- so what happens is when he gets the new robberies, he violates the DUI charge, and that's what puts him in Criminal History Category II.

We believe that it should appropriately be under Criminal History Category I. And, again, I address that in the sentencing memorandum, page 3 of 7, paragraph 2. And in it I note USSG Section 4A1.3(b). It's a policy statement, Your Honor.

And, again, it talks about if there's reliable information that exists that the defendant's criminal history category substantially overrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, then a downward departure may be warranted.

And we would also -- under a variance, we would have that kind of argument too.

THE COURT: All right. Well, to the extent it's a guideline argument, we have to -- we have to address those separately. Because you didn't raise it as an objection, I -- which is where we would normally -- if it was -- if it was a guideline argument, normally we would deal with it in the objections.

MS. NEWTSON: Okay.

THE COURT: That's why I assumed it was a variance.

So let -- so I'll have to hear from Mr. Talbot as to his response to an adjustment of the guidelines down to a Criminal History Category I based on 4A1.3.

Do you have anything else with respect to the motion for downward departure?

MS. NEWTSON:  The rest, Your Honor, would fall under more variances.

THE COURT:  Okay.  Mr. Talbot, let me ask you -- so that's the -- the -- I guess the defendant is somewhat belatedly, although maybe not because it was in the memorandum -- but is objecting to the Criminal History Category II and requesting that the Court depart downward, under 4A1.3, based on the defendant's position that Criminal History Category II substantially overrepresents his criminal history or the likelihood that he will reoffend.

What's the United States' position on that?

MR. TALBOT:  Your Honor, our position is that Category II does appropriately capture his prior criminal history conduct.

Obviously if he's a -- I mean, I is reflective of no criminal prior history whatsoever or, you know, effectively minimal.  But he does have a prior DUI, which is not -- I mean, I might be in a different posture if all he had, you know, had been an improper lane change.  And I'm not even quite sure that even gets you a point.  It may not.

But it is a prior DUI.  He was on a term of probation for that.  And he -- he did commit the instant offenses, and, in fact, he had begun committing the robberies before that sentence was imposed.  He started his robberies in November of 2011.

And so this is -- you know, in terms of getting that bump up which takes him into Category II, Your Honor, I would take the position that it's appropriate, and it captures a -- some criminal history but not -- no -- he's not a zero there, and so the Category II is appropriate.

THE COURT:  All right.  4A1.3(b) provides that if reliable information indicates that the defendant's criminal history category substantially overrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.

Mr. Battles is a Criminal History -- is scored as a Criminal History Category II.  He has -- because he has two criminal history points.  One criminal history point is received for the DUI, and then he receives a second criminal history category -- or, I'm sorry, a second criminal history point because he committed the instant offenses while he was under a sentence for that DUI.

I guess, you know, I see this a little differently than the defense does, and it seems to be the suggestion that

the second criminal history point is too much because the only reason he gets a second point is that he committed these offenses while he was on probation.  But that's actually the whole point, is that the defendant did commit these new offenses while on probation.

And so that -- rather than lessening the likelihood that he would commit new offenses or lessening the severity of his crimes, it makes them more egregious.

And so, you know, Criminal History Category II, which is -- is the lowest you can be other than having no criminal history, seems to me to be entirely appropriate.  While he only has one prior conviction -- well, only one prior scored conviction, the commission of these offenses while serving a probationary sentence suggests that the defendant is likely to commit additional offenses.

And so I just -- I don't see how -- I don't know what it is that I would be looking at that would suggest that Criminal History Category II overstates the likelihood that he would commit further offenses or the -- or the seriousness of his criminal history.

And so to the extent that that's an objection or a request that the Court depart downward, the facts of this case simply do not warrant a downward departure for criminal history category overrepresentation.  Criminal History Category II appears to fit Mr. Battles appropriately based on his criminal

history, so I'll -- I will deny that request.

And then -- then we're back to the motion.  And what I'm not -- I'm just -- what I'm not certain of is how I apply the -- if I grant the motion for downward departure, how I apply the reduction to the 924(c) counts.  I've just not seen that.

I guess the way the government is proposing I do it is -- is consistent with -- what is it, *United States versus Head*?  I think that the -- that is, starting at the first point in the guidelines where you -- guideline range where you find the minimum mandatory and then departing downward from that.

Ms. Newtson, setting aside the question of how many levels, are you in agreement with the way the government is suggesting I apply any downward departure?

MS. NEWTSON:  No, Your Honor.

THE COURT:  I'm sorry?

MS. NEWTSON:  No, Your Honor.

THE COURT:  You're not in agreement?

MS. NEWTSON:  Not with that formula, no, Your Honor.

THE COURT:  Okay.  So how are you saying I should do it?

MS. NEWTSON:  Well, Your Honor, as far as our argument for the sentence, that's when I would incorporate the variances that we're requesting.

THE COURT:  Okay.  But I have to -- we decide

guidelines first, and then we argue variance.

MS. NEWTSON:  Yes.

THE COURT:  And so I have to -- I can't get into variance issues until I know guidelines.  And so -- so right now I need to get to a point where we have guidelines --

MS. NEWTSON:  Yes, Your Honor.

THE COURT:  -- and that requires me to rule on the government's motion for downward departure first.

MS. NEWTSON:  Well, Your Honor, this is the defense argument.  We know that the 924(c)s -- the robberies without the 924(c)s, they're the ones that have the actual guidelines that probation has, you know, come up with.  And Mr. Talbot's asking for the four-level downward departure from those with the Criminal History Category II, which puts him at level 26, Criminal History Category II, so that one is out of the way.

The two 924(c)s, with the 5K and the 3553(e) filed, that allows the Court, is my understanding, to go below the minimum mandatories, to basically give him anything, I understand, from time served up to life, to the max.

What we're going to be requesting at the end of this case is that the Court fashion a sentence -- understanding that there's three things that need to be run consecutive, the robberies and the two 924(c)s, to come up with a total sentence of ten years, is what, you know, we're requesting on behalf of Mr. Battles.

So we haven't put ours into, let's say, a specific formula, pattern.  So that would be our request, so that's therefore why we're not agreeing with the formula being used by Mr. Talbot.

THE COURT:  All right.  Okay.

MS. NEWTSON:  Yes, Your Honor.

THE COURT:  So what the government has proposed is that the Court depart downward by four levels as to the robberies, which as counsel agrees gets us to a level 26, Criminal History Category II, 70 to 87 months.

And then with respect to the first 924(c), that the Court apply that same four-level reduction to that offense by starting at criminal -- at level 26, Criminal History Category II, which is 70 to 87 months.  Because the minimum mandatory consecutive sentence is a sentence of 84 months, and level 26, Criminal History Category II, is the first point in the guidelines -- well, for Criminal History Category II, level 26 is the first point where you get an 84-month sentence, and so if the Court departs downward by three levels as to that -- by four levels as to that, we end up at a 22/II, which is 46 to 57 months.

And then with respect to the second 924(c), the government is recommending that same four-level downward adjustment be applied there by starting at level 38, which is the first place that the 300-month minimum mandatory would

appear for a Criminal History Category II, and depart downward four levels to 34, which would make the guideline for the second 924(c) charge to be 168 to 210.

I've not had to apply a -- I've not considered the mechanics of applying a 5K to a consecutive 924(c) charge.  But the way the government has proposed doing it is reasonable, and it gives the defendant the benefit of the departure not just to the guideline-scored offenses, but also to the 924(c)s.  And not -- not hearing any other proposal, I'm going to go ahead and follow the government's mechanics of applying the downward departure.

So I'm going to grant the government's motion, and I'll depart downward by four levels as to each of the calculations, which will give us a guideline term of imprisonment, for Counts One, Three, Five, Seven, Nine, Ten, and Eleven in the 2012 case and Counts One through Four in the 2013 case, of 70 to 87 months.

As to the first 924(c) charge, which is Count Two of the 2012 count -- charge, I'll depart downward to a guideline range of 46 to 57 months, and as to Count Four in the 2012 case, will depart downward to 106 to 210 months as the guideline range.

And then, Mr. Talbot, you've told me that that's going to be your recommended sentence.  Do you want to be heard further as to that?

MR. TALBOT:  I did have some additional observations, but at the end of the day, yes, that is -- that is going to be the number that we are going to recommend.

THE COURT:  All right.  Well, let me hear your thoughts on the sentencing, and then I'll hear from Ms. Newtson and all of the variance issues as well.

MR. TALBOT:  Yes, Your Honor.  And I'd also note that there are some family members, I believe, that were going to address the Court as well.

Obviously, it's always a bad day when we have to see a young man before the Court, especially facing these serious charges that are before the Court today.

I was struggling to try and remember, and I think the reason I was struggling to remember is I don't think I've had a defendant quite like Mr. Battles with 11 armed robberies.  Six of them he committed by himself.  Five of them he committed with one or more codefendants, who had a background that was just full of promise and opportunity that, tragically, he, you know, just went in a direction that he never should have gone.

I have an opportunity to go out to high schools around our area and talk to students about gun crime.  That's one of the things we do with our outreach program.  I go to Hamilton County High School on a regular basis.  I actually went back and looked.  I missed Eddie Battles by six months.  My first trip to Hamilton County was in September of 2007.  He

had already graduated.

But on a trip out there about a couple years ago, I actually had a teacher pull me aside.  And what I didn't know is that Eddie Battles was -- may have been one of the best athletes they've ever had come through Hamilton County High School, and it was shocking to them that this -- this had occurred from one of really their brightest stars.

I actually Googled Eddie Battles, and had never done that before this morning, and there are several newspaper articles highlighting him, and they only mentioned him as the player scoring multiple touchdowns.  He was the -- running for touchdowns, passing for touchdowns.  And certainly, when he graduated from high school in 2007, full of promise and opportunity.

He actually reminded me this morning -- I had forgotten -- he even had scholarship opportunities to go to college for football.  Instead he went to work, which is certainly not a bad thing, and he -- laid out on page 21, it tracks his work history.

He worked in a jail when he was working for the sheriff's office.  He worked at Dollar General in Lake Park, which I believe, if I've got my locations right, that was actually the first of the Georgia robberies, was the store he had been the assistant manager in.  And I -- you know, obviously he learned a little bit about the inside mechanics of

a Dollar General when he worked there.

This is a man who was teaching school part-time as an assistant at the same time that he was committing these robberies. And he really just had, night and day, two different sides of him.

And, unfortunately, based on the nature of the crimes that he committed and the repetitive -- I mean, this isn't -- obviously it's not one robbery; it's 11. And these aren't nonserious robberies. Every single one of them -- even though Mr. Battles was not the one always carrying the gun, every single one of them had a firearm involved and a firearm brandished in the robbery.

So it is -- and it's a -- it is a crime with -- and I know we don't have victims here, but these are -- these are folks not of means. They're folks that Mr. Battles knows -- he knows exactly what they're like. They're like him. They're just trying to make -- make a living working at a Dollar General.

That's who's suffering. You know, becoming the victim of the robbery are the people that are just there, you know, working, oftentimes, late at night at these stores. These aren't -- these aren't people of means that are the -- you know, obviously he's taking the money from a billion-dollar company, but the people that he's pulling the gun on are not and didn't -- did not deserve that.

We also had some of the robberies, some of the later ones, there were several customers, even some young kids, that were present.  And so it was -- it was horrendous what he did.

The need for punishment is real, and that is probably, under 3553, one of the most salient things that exist in this case.  There is a real need for punishment.  There needs to be punishment when somebody robs 11 stores with a gun.

And I wish there was -- I wish there was some way around this.  I mean, I -- part of me wishes that this had just been a drug crime or something without victims, but it's not. It is very serious.

In recommending the reduction -- and I am -- I am -- I will say I am thankful that Mr. Battles was able to do something.  I am thankful that I'm not standing here talking about 32 years mandatory consecutive to whatever he gets on the robberies.  I am asking -- and, again, I -- there's no -- there's no magic in what I tried to do with the guidelines. Obviously the Court can see that.

Ultimately where -- and I was trying to punch in the calculator to kind of verify my math a little bit.  Ballpark, it's roughly a 38 percent reduction overall for the sentence, if we look at the big number of 454 months, with what I'm recommending, which takes us down to 284 months, which is still a very long sentence.  I recognize that, but I would argue that given the crime that's been committed, even in -- it is a

reasonable sentence.

It is -- it is -- it will be a sentence that Mr. Battles will -- and that's -- that 284 months is a little less than 24 years, but I do submit to the Court that that reduction is appropriate given what he did with the cooperation.

I would disagree that a -- that -- taking him down to a ten-year sentence, that would be less than reasonable given the -- given the underlying crime that has been committed.

And that's going to be my recommendation. I could probably stand up here for -- for quite a bit longer kind of lamenting the choices that Mr. Battle made -- Mr. Battles made. But this day -- even though he's obviously going to be sentenced today, this day was cast November 28th, 2011, the day he decided to walk into his first Dollar General with a gun.

And so that -- Mr. Battles, that's the day that this -- that this happened, where he made that -- obviously none of us were there. His family wasn't there with him, but it was on that day that he made absolutely the worst decision he has ever made.

And it is -- it's the recommendation of the United States that he be sentenced to the total of 284 months, with the forfeiture and the money judgment, and I would recommend a term of five years of supervised release to follow the sentence.

THE COURT:  All right.

MR. TALBOT:  Thank you.

THE COURT:  Thank you, Mr. Talbot.

Ms. Newtson?

MS. NEWTSON:  Yes, Your Honor.

And, Your Honor, I do have a couple of people to testify here too, and did Your Honor want to take that first, or did you want to hear my argument?

THE COURT:  Whatever order you want to go in.

MS. NEWTSON:  Okay.  Your Honor, we'll start with the arguments.

THE COURT:  Okay.

MS. NEWTSON:  Your Honor, again, based on the defendant's sentencing memorandum that was filed, there are other issues that we haven't addressed that I just want to point out to the Court.

Page 4 of 7 talks about the mental and emotional condition that may be relevant in determining whether departure is warranted.  And I just wanted to make a correction.  I have put down USSG Section 5H1.4.  It should be Section 5H1.3.  I caught that this morning when I was reviewing this again.

This is a section that was also included in the mitigation report that was provided to the Court and Mr. Talbot, and these are also things that we wanted the Court to consider under 18 U.S.C. Section 3553.

Basically it just covers what Mr. Battles has gone through in his life and what kind of childhood he had. And the PSR and the mitigation report really cover the substance of how Mr. Battles grew up, but I just wanted to add a few things so it could be on the record.

Again, Mr. Battles' mother had him when she was very young. She was 12 years old. She was in and out of his life. Again, she was very young herself. So mainly he was left to be taken care of by a great-grandmother, who was elderly, who was sick.

He grew up in extreme poverty, not really getting much financial help, it appears, from family members, so him and his great-grandmother had to do with what they had.

So, again, it was just a bad situation. There's some personal history that we included in the mitigation report that we didn't put on the sentencing memorandum for a reason.

THE COURT: I saw that.

MS. NEWTSON: Yes, Your Honor.

So, again, just a bad childhood to where it's surprising as to how well he was still able to do in school, how well he was able to do in sports.

But we argue that although he was able to do well during that specific stage of his life, that it's definitely possible and probable that things from his bad childhood carried into his adult life, especially things such as

decision-making or whatnot.

So we want Your Honor to take a look at those factors regarding the 3553 analysis of the history and characteristics of the defendant. You know, again, the sentence is supposed to produce something that's not greater than necessary. We do believe that the amount of time that the prosecution is asking for still is greater than necessary for a person that has had the life that Mr. Battles has had.

And in connection with one of those -- with that statement, when I went through the grouping of the robberies, Your Honor, obviously I noticed, just like everyone does, correctly, it already accounts for level increases when there was a weapon that was used, possessed, or brandished. And that was done in Count Five, Count Seven, Count Nine, Count Ten, and Count Eleven of the indictment, and those were times when Mr. Williams, his codefendant, had the weapon.

Regarding the counts that were brought over from Georgia, it does point out that Mr. Battles was on his own in those robberies and had a weapon. But, again, the weapon itself and brandishing, possessing, or carrying already -- was taken into consideration to where he did receive level increases, usually five or six. One time it was three.

So, again, I just want to point out to the Court that those things have also been taken into consideration when also looking at the 924(c)s that are specific to, again, having a

weapon.

THE COURT:  But those -- the 924(c)s are attached to the robberies where there was no enhancement for the brandishing.

MS. NEWTSON:  Right.  I understand that.  I'm looking at the overall picture of how the weapon issue was addressed.

Your Honor, Mr. Battles has been in confinement ever since he was in federal custody, custody overall being close to two years, and it's obviously harsh punishment to be in confinement for that long.

While he has been in federal custody, he hasn't provided any issues, no acts of violence.  Obviously, then, he has cooperated.

Although these crimes were many, they were within a short amount of time span in Mr. Battles's life.  He was still young at the time.  Back in 2011 he was 24 years old.  He had lost his job in corrections because he took on a night job and didn't tell his day employer about it, is the reason why he lost that job, to where then he, you know, became a substitute teacher.

We believe that based on his growing up, lack of direction, obviously lack of having parental guidance, lack of having any adults to really guide him throughout the way, except his great-grandmother, you know, raising him the best she could, that he didn't formulate that kind of little voice

that we all have when you're put in a tough position and faced with difficult situations and what to do.

He was going through a period where him and his wife had separated.  He was seeing someone else that was demanding on him financially, and it was just aberrant behavior, Your Honor.  This is not something at all like what he would have done before.

And, Your Honor, he's not the kind of person that's going to be a recidivist.  We do believe that he has a low level of recidivism, just based on everything that we have seen in his 26 years of life.

Your Honor, he wants to be able, at some point, to get out in the community and work.  He has plans for that, for when -- when he is released from his prison sentence, and work and pay back the money that he owes to these victims.  So we would ask the Court to consider that when providing a sentence.

Your Honor, we did want to also request the total credit time since his arrest in April 18, 2012, and the way that -- my number calculation, from April 18, 2012, to today, is 714 days.  We would ask that he receive credit for that.

A few other requests to the Court is that he not be housed in the same facility, obviously, as Robert Spiker, and we also would like that -- there would be a recommendation for him not to be housed in the same facility as John Spaulding and Joshua Spires.

Another recommendation that we have is if Your Honor could recommend to corrections that he does receive counseling. There are emotional problems, Your Honor, problems from childhood, sexual abuse problems. However that can be worked in while he is spending his sentence, that -- you know, we would request that.

And also, Your Honor, because he has been in confinement while awaiting sentence, we would request that his status, possibly, going up to corrections now, be not one of confinement. And, again, I'm not sure how that exactly works.

THE COURT: I -- there's nothing that the Court -- the Court doesn't play any role in the designations regarding security levels or -- that's just -- that's Bureau of Prisons, and I can't make a recommendation on that.

MS. NEWTSON: Yes, Your Honor. Okay.

So, again, Your Honor, you're going to hear from some witnesses, including Mr. Battles. He wants to make a statement to the Court.

And we're asking Your Honor to take everything into account that you've seen in all these reports, everything that everyone has said here today. And, again, we just believe that the sentence that's proposed by the government is harsher for the circumstances and for the person that Mr. Battles is.

And we are asking that the Court vary downward from the guideline range and fashion a sentence that would fall

within ten years, a ten-year sentence, taking into account that there's three different things that need to be run consecutive.

And, Your Honor, at this time, if Your Honor would allow, I could call the witnesses.

THE COURT:  Certainly.

MS. NEWTSON:  Yes, Your Honor.  First we will call Tameka Battles.

Ms. Battles?

Would you want her to come stand next to me, Your Honor?

THE COURT:  Yes.

And, ma'am, I'm going to ask you to spell your name for us, please.

MS. BATTLES:  T-a-m-e-k-a, B-a-t-t-l-e-s.

THE COURT:  All right.  Thank you.

Go ahead.

MS. NEWTSON:  Thank you.

Ms. Battles -- and, again, how are you related to Mr. Eddie Battles?

MS. BATTLES:  I'm his mother.

MS. NEWTSON:  And what do you do for a living?

MS. BATTLES:  I'm a homemaker.

MS. NEWTSON:  Ms. Battles, if you can expound for us and tell us a bit about Eddie Battles' childhood.

MS. BATTLES:  It was rough.  We was poor.  We didn't

really have anything.  And I was young when I had him, so I left him with my grandmother.

MS. NEWTSON:  All right.  And what kind of condition was he living with or living in while he was with his great-grandmother?

MS. BATTLES:  It was a real beat-up old raggedy board house, and they moved from there to the projects.

MS. NEWTSON:  Okay.  And when he was young -- let's say, before, you know, 18 -- what kind of relationship did you have with your son?

MS. BATTLES:  We had a decent relationship, but it wasn't that good.  It was a little rebellious, but not to the point of just to say a bad kid.  He never was.

MS. NEWTSON:  Okay.  And once he became an adult, did the relationship get better?

MS. BATTLES:  Yes.

MS. NEWTSON:  Can you tell the Court what kind of person Eddie Battles is as an adult?

MS. BATTLES:  He's very caring, and he's helpful.  He's the type of person that if you're broke down on the side of road, he'll stop and help you.  If you want something to eat, he's going to feed you.  He's a very good young man.

MS. NEWTSON:  And, Ms. Battles, knowing Eddie Battles and knowing the charges that he's here today to be sentenced on, what would be your opinion as to whether he would be a

threat to the community once he gets out from his sentence?

MS. BATTLES:  Definitely not.  He's a -- he's a real good young man.  I just -- I really don't know what to say because I don't understand what happened.

MS. NEWTSON:  Okay.  And, Ms. Battles, you know, understanding that the Court's the one that's going to fashion a sentence for Mr. Battles, what would you like the Court to consider when the Court's making that decision?

MS. BATTLES:  Consider that he has a daughter, and he's my son, and I love him.

MS. NEWTSON:  Okay.  Anything else you want to say?

MS. BATTLES:  No.

MS. NEWTSON:  Those are all the questions for Ms. Battles, Your Honor.

THE COURT:  Thank you, ma'am.

MS. BATTLES:  Thank you.

MS. NEWTSON:  Your Honor, a second witness is Kadurick Walker.

Mr. Walker?

MR. WALKER:  Yes, Your Honor.

THE COURT:  Spell your name for us, please, sir.

MR. WALKER:  Kadurick Walker, K-a-d-u-r-i-c-k, W-a-l-k-e-r.

THE COURT:  Go ahead.

MS. NEWTSON:  And, Mr. Walker, how do you know Eddie

Battles?

MR. WALKER:  I know Eddie -- he came to work with me. I hired him washing dishes and prepping on the weekends when he was off of school.

MS. NEWTSON:  Okay.  And about -- where did he work when he worked for you?

MR. WALKER:  Farmhouse Restaurant.

MS. NEWTSON:  Okay.  And --

THE COURT:  I'm sorry.  I didn't understand that. For what?

MR. WALKER:  Farmhouse Restaurant.

THE COURT:  Farmhouse Restaurant?

MR. WALKER:  Yeah.

MS. NEWTSON:  And where is that located?

MR. WALKER:  Lake Park, Georgia.

MS. NEWTSON:  All right.  Do you recall about what age he was when he was working for you?

MR. WALKER:  16, yeah.  He worked for, like, three-and-a-half to four years just on and off, part-time, when he was out of school and spring break and all of this and that.

MS. NEWTSON:  Did you get to know Eddie Battles well?

MR. WALKER:  Yeah, uh-huh.

MS. NEWTSON:  What kind of person was he then?

MR. WALKER:  Oh, happy.  He'd come to work and get everybody going.  He singing around, dancing, and everybody

just really enjoyed being around him.

MS. NEWTSON: And after he left that restaurant, did you stay in touch with him?

MR. WALKER: Uh-huh. He came back there with some of his girls. Come out to eat all the time.

MS. NEWTSON: Okay. And what kind of person is he as an adult?

MR. WALKER: Oh, a fine young man. As a matter of fact, there was a state trooper that wanted to get him into -- that was talking about trying to get him made into a state trooper before all this happened, and I'm not sure what happened. He's a really fine young man.

MS. NEWTSON: And you're here today, I guess, had to drive, because you care about him?

MR. WALKER: Yes.

MS. NEWTSON: Okay. Is there anything else you'd like to tell the Court about Eddie Battles?

MR. WALKER: Well, not really. Just he's a nice young man.

MS. NEWTSON: Thank you, Mr. Walker.

MR. WALKER: All right. Thank you.

THE COURT: Thank you, sir.

MS. NEWTSON: Your Honor, at this time we'd like to call Mr. Battles.

THE DEFENDANT: First, I would like to apologize for

the things I've done to the victims, even though none of them are here.  And I know this is not my character, and -- and I've debated a long time on what to say and how should I address the Court.

And I can't apologize enough, Your Honor, for what I've done.  And I am sorry.  And I've lived for the past two years incarcerated, waking up, going to sleep, having to obey and listen to the deputies and the officers.  And it's not something that I enjoy, but I understand that it's because of the place that I've put myself in.

And I know that the Court has to consider whether I would reoffend or have I learned my lesson, and even to this point, I have.  And I know that there is an extent or an extended time that I must still be incarcerated.  But as I addressed with my lawyer, I would like to tell the Court why I done what I done because, see, the mitigation doesn't say that. The PSR doesn't say that.

And, in fact, when I lost my job, I went through some things.  I -- I was, you know, separated from my wife, and I had my daughter to take care of and my two stepsons.  And it still doesn't make an excuse for doing what I done.

And at the time I was -- I felt like I was too good to go and work for someone lower or to go back to my former employer.  My ego was too big.  And although my mom would call and need money, and there would be people around me that wanted

things and -- everyone depended on me, and I felt like I needed to supply.

And after getting away with what I done, I really got carried away, and it's embarrassing. It's hard to sit here and admit, but I'm a person of responsibility, and I'm responsible for what I've done. And I don't want you to have no doubts about what I was thinking or what was going through my mind at the time.

And my mom, she questions all the time, "Why did you do it, son? This is not like you." And although I was raised in poverty and in a challenging childhood, I was taught right from wrong.

And also I would like to address something I just read last weekend in my codefendant brother's report, but, Your Honor, I don't coerce. I didn't coerce. What we did was wrong. I'm going to be responsible for me, and that's all I can do.

And I will spend every waking moment improving who I am. It was challenging to get through high school. It was challenging to get through life as an adult, but I was committed to being a better person.

And whatever the punishment that I get, whatever time that you give me beyond this, I'm going to take it, I'm going to accept it, and I'm going to get done with it. And my goals are to get back to my kids and pay back to the people who I've

taken from and better myself as a person, a man, and a father.

Thank you.

THE COURT:  Thank you, sir.

MS. NEWTSON:  Your Honor, I don't have any more witnesses, and that's my argument.

Thank you, Your Honor.

THE COURT:  Thank you.

Ms. Newtson, any reason why the Court should not proceed with the imposition of sentence at this time?

MS. NEWTSON:  No, Your Honor.

THE COURT:  Mr. Talbot?

MR. TALBOT:  No legal bar to sentence, Your Honor.

THE COURT:  I know you all are staring at me wondering, "What's taking her so long?"

What's taking me so long is that -- sentencing is always hard, but, I mean, there's no -- there's no such thing as an easy sentencing.  But Mr. Battles' case is particularly difficult, in part because of the -- sort of the two faces of Eddie Battles that the Court is being presented with.

On one hand, I have an individual who committed eight very serious offenses, offenses that really scare people.  You know, you walk into an establishment with a gun, and you point it at someone, and it scares the tar out of people.  And it's a bad, bad thing to do.

And you didn't just do it once; you did it 11 times.

And all indication in that presentence report is that the only reason you stopped is because you got caught.  And so that -- that warrants a serious sentence, and that's why your guidelines, walking in here, were 492 to 519 months.  You know, that's where we started with the guidelines.

Now, the other side of that is the Eddie Battles before these offenses that I've heard about and the person who, at what I would consider -- although nobody has said this, but I would consider to be at real risk to himself, alerted the authorities to Mr. Spiker's plans.

And I say at real risk because Mr. Battles had been incarcerated with Mr. Spiker long enough to know that he's a dangerous guy, and talking about Mr. Spiker could certainly get someone hurt.  And yet Mr. Battles didn't hesitate at all to do the right thing, and you're certainly to be commended for that. I'm just trying to balance the two things.

I mean, there's no question that there are reasons to vary downward.  There's no question that you're to receive some benefit for your cooperation, and, you know, even the reduction to 284 months under the guidelines is a significant reduction. I'm -- I'm just struggling with whether it's the right reduction or not.

I'm going to take about a ten-minute recess.

MS. NEWTSON:  Yes, Your Honor.

THE COURT:  I'll come out and impose -- do you need

to be someplace?

MR. TALBOT:  Your Honor, I was wondering, I have probably about a ten-minute hearing in front of Judge Barksdale on a violation of supervised release.  We're moving for detention.

Would it be okay if I cover that and come right back?

THE COURT:  Yeah.  Were you supposed to be in front of her at 3 o'clock?

MR. TALBOT:  I was.

THE COURT:  Okay.  Yeah.  Let them know that Mr. Talbot is on his way.

And we'll reconvene -- why don't we just say we'll reconvene at, like -- do you need until 3:30?

MR. TALBOT:  That would be plenty of time.

THE COURT:  That would give me time to make sure I know what I'm doing here.

MR. TALBOT:  Thank you, Your Honor.

MS. NEWTSON:  Thank you, Your Honor.

COURT SECURITY OFFICER:  All rise.

(Recess from 3:06 p.m. until 3:33 p.m.; all parties present.)

COURT SECURITY OFFICER:  All rise.  This Honorable Court is now in session.

Please be seated.

THE COURT:  I appreciate everyone's patience.

I'm going to reverse myself -- or one of the rulings that I made earlier. And I'm going to do that because I realized, as I was struggling with determining an appropriate sentence for this particular individual, a significant part of what I was having difficulty reconciling was the extent of the consideration that Mr. Battles should receive from -- based upon his cooperation.

And so -- and I really don't think that that was the right place for me to be thinking about that. I think that I should have dealt more appropriately with that in ruling on the government's motion for a reduction of his sentence, document No. 69. And I granted it and departed downward by four levels, as was recommended by the government.

But what I was struggling with is that I really think that his cooperation merits more than the four levels and that -- and so what I'm going to do is reverse myself on that and grant the motion but depart downward by six levels rather than the four levels, which is what I had previously done.

Now, technically I can do that -- I guess I could accomplish it by a variance, but I think it would be more intellectually honest to do it in this way.

Mr. Talbot, is there any objection to my reversing that ruling?

MR. TALBOT: There's not.

THE COURT: All right. So I'm going to depart

downward by six levels.

And where that takes us, with respect to the guidelines, is, in doing it the same way that we did it before, then, as to the robbery offenses, we end up at a 24/II, which is 57 to 71 months.  For the first 924(c), we end up at 37 to 46 months, and for the second 924(c) we end up at 135 to 168 months.

And so what my intention is with that is to impose a sentence of -- is to impose a sentence, as to the robberies, of 57 months; as to the first 924(c), of 37 months; and as to the second 924(c), 100 months.  So it's a guideline sentence as to the robberies, a guideline sentence as to the first 924(c), and a variance to 100 months as to the second 924(c), giving us a total sentence of 194 months, and that's the sentence I intend to impose today.

As I said, my -- with respect to the motion for downward departure, the more I thought about Mr. Battles' cooperation efforts, I felt that it merited greater consideration than the four levels, both based on the quality of his cooperation, and that is the three separate cases in which he cooperated.

But also, as I indicated, the cooperation with respect to Mr. Spiker is of a unique nature because not only did Mr. Battles assist in the conviction of the individual, he actually prevented the offense from occurring, which isn't --

usually people are just helping after the fact.

But this was -- his assistance in preventing -- preventing Mr. Spiker from potentially harming a prosecutor and/or a judge in open court during a proceeding is significant, and he certainly, as I said, is commended for that.

And I, having read enough about Mr. Spiker, feel that in doing that, Mr. Battles did it at risk to himself.  And so for those reasons, I felt that a greater downward variance is warrant- -- or a greater downward departure was warranted.

And then that left us -- or that left me with a -- with a guideline sentence that would be 229 months.  And I looked at that guideline sentence, and with respect to all of the other 3553 factors -- and as I said -- as I said to you earlier, Mr. Battles, what you did is really -- it was bad. And, you know, it is difficult to minimize 11 robberies and, you know, 20 -- I counted at one point.  I think -- I think it was close to 30 actual victims, individuals who were part of robberies.

And so, you know, those -- that requires a significant sentence in order to accomplish just punishment, in order to accomplish deterrence.

But at the end of the day, though, to me, the -- another 135 months on top of the sentence for the second 924(c) was just -- to my mind is just more than necessary to

accomplish any of the statutory purposes of sentencing.

And so for that reason I've imposed a guideline sentence, or what becomes a guideline sentence after the departure for the first two offenses, but would vary downward to a hundred months for the second 924(c), because I just don't -- I just don't think any more time is necessary to accomplish the purposes of sentencing.

The sentence of 194 months that I intend to impose today is a very significant sentence, and I wish there were a way around it, but unfortunately we can't -- we can't erase some of the things that happen, and there has to be an appropriate sentence for those things.

But I've tried to take into account the good things that you've done, Mr. Battles, and your -- and I've taken into account that, while there were 11 robberies, this was a short period in your life that does seem to be out of character from the person that you have otherwise been.  And so in balancing those things, I've arrived at the 194 months.

It's certainly more than, I know, counsel argued for. It's less than the government argued for.  I don't know if that matters, but I -- I'm -- I think I've tried to consider all of the factors and have determined that that's the sentence.

And so, Ms. Newtson, if you and Mr. Battles would come up to the podium.

Let me see counsel and the probation officer at

sidebar for just a moment.

(At sidebar:)

THE COURT:  Mr. Blakely, I know that you didn't do Mr. Williams' presentence report.  I know -- and I haven't seen it yet because his sentencing is coming up.

I know he has a greater criminal history, but tell me -- can someone give me an idea of what his guidelines are?

MS. NEWTSON:  I don't know.

MR. TALBOT:  They're higher.  Mr. Williams just got out of prison, and he wasn't even out two or three weeks before he started, so he -- his category is higher.

THE COURT:  Okay.  I guess I just wanted to make sure he wasn't going to be less.  If he's higher --

MR. TALBOT:  Yeah.

THE COURT:  -- I don't think that affects my --

MR. TALBOT:  Yeah.  You're -- no.  He's --

PROBATION OFFICER:  He's higher.  He still has the 32-year mandatory.  I think his -- I think I remember seeing his guidelines are 135, but --

MR. TALBOT:  Yeah.  It was -- actually, I have it in my file, if you want me to --

THE COURT:  Yeah.  Yeah.  Please.

I've forgotten.  Was it Williams who cooperated --

PROBATION OFFICER:  It was Williams who cooperated against Mr. Battles.

MS. NEWTSON:  About the letter.

THE COURT:  About the letter.  Okay.

So he's got 130, plus the 32 years.

And is he getting a 5K?

MR. TALBOT:  We filed a two-level 5K for him.

THE COURT:  Under 5K and 3553 or just --

MR. TALBOT:  Uh-huh.  Yeah.  He will be -- I mean, he'll effectively be two levels down from ...

THE COURT:  Okay.  All right.  Thank you.

(End of discussion at sidebar.)

THE COURT:  All right.  I've done this a little bit backwards because I've already told you-all what sentence I intend to impose, but I do still have to impose sentence.

Did I ask you-all if judgment -- yeah, I did.  All right.

The Court has asked whether judgment should be pronounced, and I've been given no cause to the contrary.  I've heard -- just a moment.

All right.  I've heard from counsel.  I've reviewed the presentence report, and I've heard from Mr. Battles.

Pursuant to Title 18, United States Code, Sections 3551 and 3553, it is the judgment of the Court that the defendant, Eddie Battles, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 194 months.

This term consists of a term of 57 months as to Counts One, Three, Five, Seven, Nine, Ten, and Eleven in Case No. 3:12-cr-157-J-34MCR, and Counts One, Two, Three, and Four in Case No. 3:13-cr-83-J-34JRK; a term of 37 months as to Count Two in Case No. 3:12-cr-157-J-34MCR, to run consecutive to the term of imprisonment announced for the robbery counts; and a term of 100 months as to Count Four in Case No. 3:12-cr-157-J-34MCR, to run consecutive to the term in Count Two, as well as the term of imprisonment in Counts One, Three, Five, Seven, Nine, Ten, and Eleven in that case and Counts One, Two, Three, and Four in the 2013 case.

Upon release from imprisonment, Mr. Battles will be required to serve a term of supervised release of three years. That's three years as to each Count One through Eleven in the 2012 case and One through Four in the 2013 case, with all such terms to run concurrently.

While on -- during that term of three years' supervised release, Mr. Battles will be required to comply with the standard conditions of release adopted in the Middle District of Florida as well as some special conditions.

You will have to submit to a search of your person, your residence, your place of business, any storage units under your control, and your vehicle by the probation officer at a reasonable time and in a reasonable manner, based upon suspicion that there is contraband or other evidence of a

violation of your supervised release present.

You'll have to tell anyone with whom you share any of those premises that you're subject to that, and a refusal to consent to a search or to allow a search will be a violation of your supervised release.

You'll have to submit to the collection of DNA.

The Court waives the mandatory drug testing requirements of the Violent Crime Control Act. However, you will have to submit to random drug tests not to exceed two per week.

You will be ordered to pay restitution in the following amounts: The total amount of restitution is $17,320. $2,844 to Dollar General at 1430 West Marion Avenue, Lake Park, Georgia; $4,020 to Dollar General at 16816 Spring Street, White Springs, Florida; $1,210 to Dollar General located at 306 8th Avenue, NW, in Jasper, Florida; $941 to Dollar General at 800 Madison Highway, Valdosta, Georgia; $4,736 to Dollar General at 471 South Church Street, Homerville, Georgia; $583 to Dollar General at 1430 West Marion Avenue, Lake Park, Georgia; $800 to Dollar General at 16816 Spring Street, White Springs, Florida; $486 to Family Dollar at 725 South Ohio Avenue, Live Oak, Florida; $1,200 to Dollar General at 10171 New Kings Road, Jacksonville, Florida; $500 to Dollar General at 3031 Edgewood Avenue West in Jacksonville, Florida.

That restitution obligation will be borne jointly and

severally by you and Eric Kevontay Williams -- no.  Only a portion of that is joint and several, and I have to do the math.

The joint and several restitution obligations -- Mr. Talbot, make sure and check this, please -- would be for the Dollar General store on New Kings Road, $1200; the Dollar General store at ...

MR. TALBOT:  Your Honor, his involvement began March 27th at the White Springs Dollar General.

THE COURT:  The second robbery at the White Springs Dollar General, right?

MR. TALBOT:  Yes, the -- yes.

THE COURT:  So the $800 -- no?

MR. TALBOT:  Yes.

THE COURT:  Yes.

MR. TALBOT:  So starting with the $800, I came up with a total of $2,986 that would be joint and several.

THE COURT:  And that would be the -- because I -- it would be the $1200 to the Dollar General on New Kings Road; the $800 for the Spring Street; $500 to Dollar General, Edgewood Avenue; and 486 to the Family Dollar.

MR. TALBOT:  Correct.

THE COURT:  Those -- those will be joint and several. The remaining obligation will be borne solely by Mr. Battles.

Ms. Newtson, is that consistent with your

understanding?

MS. NEWTSON:  Yes, Your Honor.

THE COURT:  Okay.  Mr. Battles, you'll have to pay -- while you're in the custody of the Bureau of Prisons, you'll have to start making payments towards that restitution.

You'll pay $25 quarterly if you have a non-UNICOR job.  If you have a UNICOR job, you'll pay 50 percent of your monthly earnings.  And then upon release, you'll be ordered to begin payments of $50 per month until that restitution obligation has been satisfied.

The Court waives the imposition of a fine.

There is a forfeiture money judgment that Mr. Battles agreed to in his plea agreement, and the Court has -- and it reflects an amount of $17,320.

Any objection to my entering that at this time, Ms. Newtson?

MS. NEWTSON:  No, Your Honor.

THE COURT:  All right.  The Court will enter the forfeiture money judgment and will make that part of this sentence.

The -- there was a plea agreement, which the Court accepts as it adequately reflects Mr. Battles' offense behavior, and it does not undermine the statutory purposes of sentencing.

I did this backwards in that I've already explained

the reasons for my sentence, and so I won't repeat that now.

Mr. Battles will be remanded to the custody of the marshals to await designation.

Does he have a request for designation, other than the separation requests?

MS. NEWTSON:  As local as possible, Your Honor, because his family is local.

THE COURT:  Okay.  Well, it would either -- that would either be Coleman or -- well, no.  It would be Coleman or Jasper because Folkston is only -- is essentially only aliens.

MS. NEWTSON:  Coleman, Your Honor, possibly.

THE COURT:  All right.  The Court will recommend designation to Coleman.

And the Court -- I will ask that it be included in the judgment that the Court requests that Mr. Battles be placed -- that Mr. Battles not be housed in a facility where Robert Spiker, John Spaulding, or Joshua Spires are held.

And also, Mr. Talbot, if you'll work with the marshals to make sure that the Bureau of Prisons gets the appropriate information with respect to those -- the reasons for that recommendation.

MR. TALBOT:  Yes, Your Honor.

THE COURT:  Mr. Battles, I'm going to encourage you to participate in whatever educational opportunities there are at the facility of designation and also any vocational programs

that are available to you.

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Ms. Newtson, any objection to the sentence or the manner in which it was imposed?

MS. NEWTSON:  No, Your Honor, but I have a question. Special assessment?  I don't know if I missed that or --

COURTROOM DEPUTY:  You didn't say that.

THE COURT:  You didn't miss it; I forgot it.

MS. NEWTSON:  Okay.  And, you know, I know that I read -- I think the statute says shall, but is that --

THE COURT:  Yeah.  The special assessment is mandatory, and if I didn't say it, we'd have to be back here. So there's -- it's -- I said earlier 1300, but now that I'm doing my math, shouldn't it be 14?

MS. NEWTSON:  It's 13.  It's nine counts under the indictment and four counts under the information, Your Honor.

THE COURT:  Right.  Count Eight and Count Six -- okay.  All right.

So the Court imposes the mandatory $1300 in special assessments.  That's $100 per each offense of conviction.

Okay.  Then with that, any objection to the sentence or the manner in which it was imposed, Ms. Newtson?

MS. NEWTSON:  No, Your Honor.

THE COURT:  Mr. Talbot?

MR. TALBOT:  No, Your Honor.

60

THE COURT:  All right.  Mr. Battles, you have the right to appeal the Court's sentence, and if you wish to pursue an appeal, you have to file a notice of appeal within 14 days.

The government also has a right to appeal.

And you are entitled to be represented by an attorney in any appeal that's taken, and if you can't afford one, the Court will appoint one to represent you.

And if you can't afford to pay the filing fee for your appeal, that's fine.  Just submit the notice, and the Court will accept it without prepayment.

Do you understand these things?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Do you have any questions?

THE DEFENDANT:  No, ma'am.

THE COURT:  All right.  Good luck to you, Mr. Battles.

And thank you all for being here today.

THE DEFENDANT:  Thank you, Your Honor.

MS. NEWTSON:  Thank you, Your Honor.

THE COURT:  We're in recess.

COURT SECURITY OFFICER:  All rise.

(The proceedings were concluded at 3:59 p.m.)

- - -

CERTIFICATE OF OFFICIAL COURT REPORTER

UNITED STATES DISTRICT COURT )

MIDDLE DISTRICT OF FLORIDA   )

I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated therein.

DATED this 23rd day of February, 2022.

s/Shelli Kozachenko_____
Shelli Kozachenko, RPR, CRR, CRC
Official Court Reporter